## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT

I, Special Agent Adalberto Garcia, being duly sworn, depose and state that:

INTRODUCTION

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed for approximately one year. I graduated from the DEA Special Agent Academy in 2019. Prior to that, I was employed as a Police Officer with the Nashua, New Hampshire Police Department for over eleven years. For approximately four years, I was assigned to the Detective Bureau. For three of those years, I was assigned to the Nashua Police Department Drug Unit. While working in the drug unit, I was primarily assigned to the DEA High Intensity Drug Trafficking Area Task Force in the Manchester, New Hampshire District Office ("MDO"), where I was deputized as a DEA Task Force Officer. Since becoming a Special Agent with DEA, I have been assigned to the DEA Cross Border Initiative Task Force ("CBI") located in Massachusetts. In addition to the DEA academy, I have attended narcotic and criminal investigation training classes put on by the New Hampshire Police Standards and Training Council, the DEA, and the Nashua Police Department. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. § 841(a)(1).

2. I have received significant training in the field of narcotics enforcement and investigations. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including

purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.

3. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4. Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses." I also am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, pager messages, and other means to facilitate their illegal activities.

5.      I submit this affidavit in support of an application for a criminal complaint alleging that on October 22, 2020, Juan R. RIVERA-CRUZ ("RIVERA-CRUZ") possessed with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

6.      Based on the facts set forth in this Affidavit, there is probable cause to believe that RIVERA-CRUZ has violated 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) (the "Target Offense").

7.      I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, court-authorized wire interceptions, and my personal review of records and reports relating to the investigation.  Since this Affidavit is being submitted for the limited purpose of securing the requested complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the foundation for this application.

## **PROBABLE CAUSE**

8.      On October 21, 2020, the Honorable Donald L. Cabell authorized a federal search warrant for the top floor apartment at 19 Haverhill Street, in Methuen, Massachusetts (described as "Target Location 2").  [20-1417-DLC].

9.       On the morning of October 22, 2020, investigators with the DEA executed the search warrant at Target Location 2.  Inside Target Location 2, investigators observed two bedrooms.  One of the bedrooms belonged to a woman who told investigators she had been staying there for only a few weeks.  In the second bedroom, which was unoccupied at the time,

investigators found men's clothing and shoes, as well as two identification cards (including a Massachusetts driver's license) in the name of Juan R. RIVERA-CRUZ.  In this same bedroom, investigators located, among other items:

    a.   a shoebox containing bag(s) of white rock-like substance, suspected to be crack cocaine, based on the color and appearance of the substance;

    b.   a corner-cut baggie containing an estimated 50-100 grams of white powder, suspected to be either fentanyl or cocaine based on the color and appearance of the powder, hidden inside of a shoe;

    c.   a digital scale;

    d.   several bottles of cutting agent (including one bottle labeled lactose and two labeled inositol);

    e.   a blender with light brown residue;

    f.   a roll of green cellophane;

    g.   and what appeared to be several thousand dollars in cash.

10.     When investigators initially made entry into the top floor apartment, they observed an internal common staircase which led down to the first floor.  This staircase led to two doors: one which led outside the building, and one which led to a first floor residence.  Investigators observed two juveniles standing outside of the first floor apartment.  Investigators asked if they could accompany the juveniles inside to ensure they were safe, and asked to speak to their mother. The juveniles allowed investigators into their residence on the first floor, through a door which was unlocked.  Inside, investigators conducted a security sweep and discovered RIVERA-CRUZ hiding in one of the juvenile's beds, where he appeared to be pretending to sleep.

11.     Based on my training and experience, I know that cutting agents, blenders, scales, and cellophane are common "tools of the trade" for drug dealers and that such materials can be used to cut larger quantities of drugs and then weigh out and package smaller quantities of drugs for sale.  Based on the presence of multiple suspected controlled substances in the very same room, I believe that these tools were (or would be) in fact used to facilitate the distribution of those controlled substances.  And, based on discovering RIVERA-CRUZ hiding within a connecting unit, and the location of two identification cards in the name of RIVERA-CRUZ among the men's clothing throughout the same room, I believe the controlled substances and drug-dealing paraphernalia all belong to, and are used by, RIVERA-CRUZ.  As such, there is probable cause to believe that RIVERA-CRUZ possessed the controlled substance with intent to distribute those substances.

12.     I believe probable cause is further supported here by observations that were made of RIVERA-CRUZ in the weeks prior to executing the search warrant.  As set forth in the October 21, 2020 Affidavit in support of the search warrant for the apartment containing the above-referenced items, which is attached hereto and incorporated herein, on October 6, 2020, at approximately 4:43 p.m., investigators observed an individual (identified as "HM" in the Affidavit, but later determined to be RIVERA-CRUZ) exit Target Location 2 holding a pair of sneakers and a gray sweatshirt tucked underneath his arm.  Partially concealed within the sweatshirt was what appeared to be a black rectangular object.  Based on my training and experience, I believe this rectangular object (depicted below, in part) was consistent with a wrapped kilogram of narcotics.



13.     As further set forth in the October 21 Affidavit, investigators observed RIVERA-CRUZ walk toward a vehicle, where he opened and closed the trunk.  RIVERA-CRUZ then walked toward the front of the building for Target Location 2 and still appeared to be carrying the clothing items in his arms, but investigators could not tell whether he was still carrying the black object. At approximately 4:51 p.m., RIVERA-CRUZ reentered Target Location 2, and by this time was not carrying anything at all.  Shortly thereafter, RIVERA-CRUZ departed from Target Location 2.  Massachusetts State Police executed a traffic stop of the vehicle driven by RIVERA-CRUZ. RIVERA-CRUZ produced a Massachusetts driver's license in the name of Juan RIVERA-CRUZ. RIVERA-CRUZ consented to a search of the vehicle, but the search did not reveal any items of note and RIVERA-CRUZ was immediately released.  Based on my training and experience, I believe RIVERA-CRUZ carried a kilogram of narcotics out of Target Location 2 and stored or otherwise dispensed with the kilogram near Target Location 2 before he drove away.

## **CONCLUSION**

14.     Based on the information set forth above, I believe probable cause exists to conclude that, on October 22, 2020, RIVERA-CRUZ possessed with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

_Adalberth Garcia_ DCC

Adalberto Garcia
DEA Special Agent

Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 this 22nd day of October, 2020.

HONORABLE DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND SEARCH WARRANT**

I, Special Agent Adalberto Garcia, being duly sworn, depose and state that:

INTRODUCTION

1.       I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed for approximately one year.  I graduated from the DEA Special Agent Academy in 2019.  Prior to that, I was employed as a Police Officer with the Nashua, New Hampshire Police Department for over eleven years.  For approximately four years, I was assigned to the Detective Bureau.  For three of those years, I was assigned to the Nashua Police Department Drug Unit.  While working in the drug unit, I was primarily assigned to the DEA High Intensity Drug Trafficking Area Task Force in the Manchester, New Hampshire District Office ("MDO"), where I was deputized as a DEA Task Force Officer.  Since becoming a Special Agent with DEA, I have been assigned to the DEA Cross Border Initiative Task Force ("CBI") located in Massachusetts.  In addition to the DEA academy, I have attended narcotic and criminal investigation training classes put on by the New Hampshire Police Standards and Training Council, the DEA, and the Nashua Police Department. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. § 841(a)(1).

2.       I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.       I have received significant training in the field of narcotics enforcement and investigations. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of

1

illegal drugs. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5. Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses." I also am

familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, pager messages, and other means to facilitate their illegal activities.

PURPOSE OF AFFIDAVIT

6.      I submit this affidavit in support of an application for a criminal complaint alleging that on Saturday, October 17, 2020, Jose Luis RUIZ VILLALONA ("RUIZ VILLALONA" or "Target Subject") distributed 400 grams or more of fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(vi).

7.      I also submit this affidavit in support of applications for search warrants for the following Target Locations, which are described in greater detail below and in Attachments A and B, and which are believed to be the residences and stash house of RUIZ VILLALONA:

     a.  **264 East Haverhill Street, Apartment 13, Lawrence, Massachusetts ("Target Location 1")**, believed to be the primary residence of RUIZ VILLALONA;

     b.  **19 Haverhill Street, Top Apartment, Methuen, Massachusetts ("Target Location 2")**, believed to be the stash house used by RUIZ VILLALONA; and

     c.  **170 Agawam Street, Apartment 3, Lowell, Massachusetts ("Target Location 3")**, believed to be another residence for RUIZ VILLALONA and his associate and/or partner Sonia Delvalle ("Delvalle").

8.      Based on the facts set forth in this Affidavit, there is probable cause to believe that RUIZ VILLALONA has violated 21 U.S.C. §§ 841(b)(1)(A) and (b)(1)(A)(vi) (distribution of 400 grams or more of fentanyl) (the "Target Offense"), and that evidence of the Target Offense, set forth in Attachments B1 through B3, will be found in the Target Locations described in Attachments A1 through A3.

9.    I am familiar with the facts and circumstances of this investigation, and I have received information from a variety of sources, including but not limited to other law enforcement officers and agents, court-authorized wire interceptions, and my personal review of records and reports relating to the investigation.  Since this Affidavit is being submitted for the limited purpose of securing the requested complaint and warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the foundation for this warrant.

**PROBABLE CAUSE**

Drug Traffickers' Use of Residences and Stash Houses Generally

10.    Based on my training and experience, including participation in other narcotics investigations and extensive discussions with other law enforcement officials experienced in such investigations, I am aware that it is generally a common practice for drug traffickers to store drug paraphernalia and records in their residences and/or "stash" or "staging" locations ("storage locations").  I have participated in the execution of numerous search warrants of the residences and/or storage locations of drug traffickers whose criminal activity is similar to that of the Target Subject.  In a substantial number of these searches executed in connection with the investigations in which I have been involved, drug-related evidence has typically been recovered, including cash, records, drugs, and other valuable items.  Based on this experience and my training, I believe that:

i.    Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system.  Accordingly, drug traffickers frequently maintain large amounts of cash and other valuable assets at their residences or storage locations in order to maintain and finance their ongoing business;

ii.    Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances, and monetary instruments

4

and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances or drug proceeds, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passport and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other storage locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Indeed, in this case, the Target Subject "fronted" approximately one kilogram of fentanyl to an undercover agent, as detailed below. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the traffickers' suppliers and the traffickers' dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficker business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences or storage locations for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

iii.    It is common for drug dealers to secrete records of drug transactions and/or financial transactions, in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement officials;

iv.    It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement officials;

v.    Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the

trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s). They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

vi. Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences or storage locations, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

vii. Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence or storage locations;

viii. Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

ix. Drug traffickers frequently possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the profits and/or supply of drugs;

x. Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

11. Based on all of the evidence I have obtained in the course of this investigation, and for the reasons more specifically set forth herein, I believe RUIZ VILLALONA, like many drug traffickers, uses his residences and/or storage location in furtherance of his ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding

those activities, including, but not limited to, the items set forth in Attachments B, will be found in the Target Locations. *See e.g., United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[1]

Background of Criminal Activity

## RUIZ VILLALONA Delivered One Kilogram of Fentanyl

12.     On October 16, 2020, at the direction and under the supervision of investigators, a DEA confidential source (the "CS")[2] communicated with his/her source of supply in recorded and maintained WhatsApp voice memos and calls (in Spanish), under the guise that the CS had clients that needed fentanyl soon and arranged to obtain one kilogram of fentanyl from RUIZ VILLALONA.  I am fluent in Spanish and I reviewed these and the other recordings discussed below.  The summaries and quoted language included below are draft translations of these communications.

13.     During a recorded telephone call/message, the CS's source of supply informed the CS that he had "work" (fentanyl) in the Boston, Massachusetts area and provided the CS with an address of 36 Young Avenue, Lawrence, Massachusetts as the location where the CS's driver could pick up the fentanyl.   As detailed below, the area of 36 Young Avenue is known to investigators as a meeting location frequented by RUIZ VILLALONA because it is very near to

---

[1] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction.  182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information relating to marijuana operation not stale)).  As the First Circuit has explained, "[b]y it's very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time."  *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

[2] CS pled guilty to narcotics trafficking offenses in another district and is cooperating with investigators in hopes of receiving leniency at sentencing.  Information provided by CS has proven reliable, and has been corroborated by other evidence collected in this investigation, including recorded conversations, narcotics seized by the DEA, and information provided by another cooperating witness.  CS is willing to testify.

his suspected residence, Target Location 1. The CS introduced, via WhatsApp, an undercover agent posing as CS's driver who would pick up the fentanyl in Lawrence the following day.

14.     In a recorded WhatsApp voice message, the CS's source directed the CS to have his/her driver arrive at 36 Young Avenue on October 17, 2020 at 9:30 a.m. In subsequent recorded conversations, the CS's source directed the CS to have his/her driver arrive at 36 Young Avenue around 4:00 p.m.

15.     On October 17, 2020, the CS's source of supply spoke to the CS in recorded calls. The source told the CS that the people in Lawrence would come out of an apartment and hand the items to the CS's driver. The source of supply asked for the type of vehicle the CS's driver (UC) would be driving. At approximately 3:01 p.m., the CS received a recorded WhatsApp voice message from the source, directing the CS to have the CS's driver (UC) arrive in approximately 20 minutes.

16.     At approximately 3:30 p.m., UC drove alone in an unmarked undercover vehicle to 36 Young Avenue, Lawrence, Massachusetts, where other investigators were maintaining surveillance. The UC, who was equipped with an audio- and video-recording device, UC notified the CS of UC's arrival at the meeting location and the CS communicated this information to the CS's source of supply via WhatsApp.

17.     At approximately 3:47 p.m., a male later identified as RUIZ VILLALONA[3] approached the UC vehicle wearing a black hooded, zip-up sweatshirt with white drawstrings, with

_____

3 Investigators obtained a copy of RUIZ VILLALONA's Dominican driver's license from other investigators who had previously conducted a traffic stop of him. Investigators here reviewed the photograph from that license and confirmed that the individual who arrived to deliver the fentanyl appeared to be the same person.

a white T-shirt underneath, and donning a white face mask, as captured in the following still image from the undercover recording device.



18.     RUIZ VILLALONA entered and sat in the front passenger seat of the UC vehicle and asked UC if he/she was on behalf of "Nacho" (a code name I believe refers to CS).  UC responded in the affirmative.  RUIZ VILLALONA was holding a cellular telephone and was talking on speaker phone to a male with a Mexican accent.  RUIZ VILLALONA told the male with the Mexican accent, "Man, here is the man."  The Mexican male confirmed with UC that he/she was on behalf of "Nacho."  The Mexican male then thanked UC.  At this point, RUIZ VILLALONA reached inside of his half-zipped sweatshirt and removed a rectangular brick of white powder wrapped in clear cellophane, and handed it to UC, as depicted in the still images below.



19.     UC took the white brick and placed it in the back seat area of the undercover vehicle.  UC thanked RUIZ VILLALONA, who then exited the undercover vehicle.  UC drove directly to meet with other investigators where UC relinquished the brick containing approximately one kilogram of white powder pressed with the imprint of a Chevrolet logo, as depicted in the photograph below.  Investigators conducted a field test on the powder, which indicated a positive result for the presence of fentanyl compound or methamphetamine.  Based on my training and experience, the color and consistency of the powder, and the field test results, I believe that the kilogram contained fentanyl.



**Surveillance of RUIZ VILLALONA Prior to Fentanyl Delivery**

20.     In anticipation of the fentanyl delivery discussed above, investigators conducted surveillance of RUIZ VILLALONA earlier in the day on October 17, 2020.

21.     At approximately 12:29 p.m., investigators observed RUIZ VILLALONA and his close associate Sonia Delvalle[4] exit the front door of Target Location 3 and walk to a Nissan SUV vehicle.  At this time, RUIZ VILLALONA was observed wearing the black hooded sweatshirt with white drawstrings, just as he appeared during the meeting with UC, depicted and described above.  Delvalle was observed carrying multiple bags, which she placed in the driver's side rear passenger seat.  Delvalle then entered the driver's seat and RUIZ VILLALONA entered the front passenger seat.

---

4 Investigators identified Delvalle by running the license plate of one of her vehicles, a white Honda Accord, which is registered in her name with an address of Target Location 3, as discussed below in paragraph 37. Investigators then reviewed the photograph from Delvalle's driver's license in the records for the Registry of Motor Vehicles and confirmed that it appeared to be the same individual.

22.     At approximately 12:45 p.m., investigators observed the Nissan SUV arrive at Target Location 2, where Delvalle and RUIZ VILLALONA parked.  Based on my involvement in this investigation to date, I know that it takes approximately fifteen minutes to drive between Target Locations 2 and 3, and so I believe Delvalle and RUIZ VILLALONA drove directly, or very nearly directly, between the two Target Locations.  Delvalle retrieved the bag or bags from the rear passenger seat on the driver's side and RUIZ VILLALONA was observed carrying a satchel type bag over his shoulder.  The two parties disappeared out of view after they entered Target Location 2 through the top, rear door.

23.     At approximately 2:24 p.m., RUIZ VILLALONA exited the top, rear door to Target Location 2 empty handed and walked down the rear stairs to the bottom floor of 19 Haverhill Street, under the stairs.  A few minutes later, RUIZ VILLALONA reappeared from under the stairs area, now carrying a white plastic bag that appeared to be weighed down by an item/items within, and carried the bag into Target Location 2.

24.     At approximately 2:47 p.m., RUIZ VILLALONA exited the top rear door to Target Location 2 and appeared to speak on the telephone before he reentered Target Location 2.  When investigators next observed RUIZ VILLALONA it was approximately 3:30 p.m. and he was observed on the balcony of Target Location 1, looking down on Young Avenue.  Investigators who were conducting surveillance of the rear of Target Location 2, and did not see RUIZ VILLALONA leave, believe he must have left from the front door of Target Location 2 before traveling to Target Location 1 some time between approximately 2:47 and 3:30 p.m.  Between approximately 3:30 p.m. and 3:35 p.m., RUIZ VILLALONA was observed coming in and out of Target Location 1 onto the balcony overlooking Young Avenue.  He was also observed moving

the blinds from inside Target Location 1 so that he could look outside through the window. Based on my training and experience and my involvement in this investigation to date, I believe RUIZ VILLALONA was conducting counter surveillance and/or watching for UC to arrive.

25. At approximately 3:35 p.m., after UC arrived at the meeting location near 36 Young Avenue, RUIZ VILLALONA appeared to look at UC's vehicle while he remained inside Target Location 1. At approximately 3:46 p.m., investigators observed RUIZ VILLALONA exit the front common door to the Target Location 1 building and walk to meet the UC in the UC vehicle. While he was walking, investigators observed RUIZ VILLALONA to be clutching his waist area holding what appeared to be a concealed, squared-off item within his sweatshirt.

26. After meeting in the UC vehicle, at approximately 3:47 p.m., investigators observed RUIZ VILLALONA reenter the building of Target Location 1 while looking all around him in an apparent attempt at counter surveillance. A few minutes later, investigators observed RUIZ VILLALONA back on the balcony of Target Location 1.

27. Based on my training and experience and my involvement in the investigation to date, I believe RUIZ VILLALONA and Delvalle travelled from Target Location 3, potentially hiding the kilogram of fentanyl in one of the bags they were observed carrying. I believe they either carried the kilogram with them into Target Location 2 for packaging, or picked up the kilogram at Target Location 2. I then believe RUIZ VILLALONA travelled with the kilogram to his residence, Target Location 1, where he waited to meet with UC outside. Based on these observations and those detailed below, I believe that RUIZ VILLALONA and his associates, including Delvalle, use all three Target Locations in furtherance of drug trafficking.

Description and Activity at Target Locations

**Target Location 1**

28.     Target Location 1 is Apartment 13 at 264 East Haverhill Street, Lawrence, Massachusetts, an apartment within a brick, multi-unit apartment building, which sits within a multi-building apartment complex.  Target Location 1 is located on the second floor of building 264, and has two, red, interior front doors, each individually labeled with the number "13."[5] Apartment 13 also has a balcony on the rear of the building, which looks out onto Young Avenue.

29.     Investigators conducting surveillance of RUIZ VILLALONA have repeatedly observed him travelling to/from Target Location 1 in a manner consistent with his residence at that location.  For example, on August 10, 2020, investigators were conducting surveillance in the area of Young Avenue and East Haverhill Street when they observed him ride by on a motorized bicycle at around 6:58 p.m.  As RUIZ VILLALONA motored along, he looked closely at each parked vehicle, in an apparent attempt to conduct counter surveillance.  Several minutes later, investigators observed RUIZ VILLALONA carry the motor-bike up the stairs of the Target Location 1 building.

30.     On or about August 18, 2020, investigators conducting surveillance observed RUIZ VILLALONA on a second level balcony of the Target Location 1 building, facing Young Avenue. At approximately 11:22 a.m., investigators observed RUIZ VILLALONA approach a vehicle parked nearby, in the area of 40 Young Avenue, for approximately one minute before returning to the Target Location 1 building.  Approximately two minutes later, RUIZ VILLALONA was observed again exiting from the Target Location 1 building, this time with a plastic bag, which RUIZ VILLALONA appeared to deliver to the individual in the vehicle.  RUIZ VILLALONA

---

[5] From the common hallway, investigators observed that each apartment within the building had two interior entry doors.

14

again returned to the Target Location 1 building. Based on my training and experience, I believe RUIZ VILLALONA delivered drugs and/or drug proceeds from Target Location 1 to the driver of the vehicle.

31.　　Subsequently, investigators entered the common hallway of the Target Location 1 building and identified Apartment 13 (Target Location 1) as the apartment corresponding to the balcony on which RUIZ VILLALONA was observed.

32.　　On or about September 9, 2020, at approximately 11:07 a.m., investigators again observed RUIZ VILLALONA exit from the building of Target Location 1 and approach the passenger side of a vehicle parked nearby, outside of 36 Young Avenue. After a brief time at the vehicle, RUIZ VILLALONA walked back into the building for Target Location 1. Less than two minutes later, RUIZ VILLALONA returned to the passenger side of the vehicle and passed a bag to the driver of the vehicle. RUIZ VILLALONA then returned to Target Location 1. Based on my training and experience, I believe RUIZ VILLALONA was delivering drugs and/or drug proceeds from Target Location 1 to the driver of the vehicle.

33.　　On September 29, 2020, at approximately 11:40 a.m., investigators observed RUIZ VILLALONA exercising in the parking lot of Target Location 1.

34.　　Based on the above, I believe that RUIZ VILLALONA uses Target Location 1 as his residence and "home base" for his drug trafficking activities and that he maintains drugs and/or drug proceeds within Target Location 1. Specifically, I believe that RUIZ VILLALONA brings and/or maintains drugs and/or drug proceeds within Target Location 1 and meets with individuals in vehicles at or near 36 Young Avenue, an area within a short walking distance from his residence, which he can safely view from his balcony at Target Location 1.

15

**<u>Target Location 2</u>**

35.     Target Location 2 is located at 19 Haverhill Street Methuen, Massachusetts and is the apartment which can be accessed via the rear outdoor stairs, which lead to a white exterior entrance door.  The white door sits just to the right of the stairs, on the wooden landing/deck area on the second floor.  This entrance door appears to be unnumbered.

36.     Investigators have observed RUIZ VILLALONA utilizing Target Location 2 on a regular basis since at least September 2020.

37.     For example, on or about September 30, 2020, at approximately 1:59 p.m., investigators observed a Hispanic male exit from the rear upstairs door of 19 Haverhill Street (Target Location 2) and proceed to a white Honda Accord, registered to Sonia Delvalle of 170 Agawam Street, Apartment 3, Lowell, Massachusetts (Target Location 3).  This male opened the trunk of the Accord and looked inside the trunk.  Approximately one minute later, RUIZ VILLALONA arrived on foot, walked up the rear stairs and entered the rear upstairs door to Target Location 2.  The male closed the trunk of the Accord and followed RUIZ VILLALONA into Target Location 2.  As he did so, the male appeared to be looking around his surroundings in an attempt at counter surveillance.  At approximately 2:45 p.m., investigators observed RUIZ VILLALONA walk out of the door to Target Location 2 and smoke a cigarette on the landing.  As he was doing so, a third male arrived at 19 Haverhill Street and carried what appeared to be a large flat cardboard box or other item into Target Location 2.  RUIZ VILLALONA followed this third male inside Target Location 2.  At 4:19 p.m., investigators observed RUIZ VILLALONA again exit Target Location 2 to smoke a cigarette, reentering the location at approximately 4:22 p.m.

38.     At approximately 5:02 p.m., RUIZ VILLALONA was observed exiting from the rear door to the first floor of 19 Haverhill Street, carrying a black satchel. RUIZ VILLALONA walked up the rear stairs and entered Target Location 2 with the satchel, exiting again after approximately one minute. At approximately 5:06 p.m., investigators observed RUIZ VILLALONA exit the convenience store across the street from Target Location 2. RUIZ VILLALONA was carrying his satchel, which appeared to be mostly full, and appeared to be closely monitoring his surroundings (including passing vehicles and pedestrians) in what appeared to be an attempt at detecting law enforcement surveillance in the area. Based on my training and experience, I believe RUIZ VILLALONA retrieved drugs and/or drug proceeds from Target Location 2 and was carrying the item(s) with him in his satchel.

39.     On October 6, 2020, at approximately 12:02 a.m., investigators observed a vehicle depart from Target Location 2 and arrive at Target Location 3 at approximately 12:17 a.m. Investigators saw two individuals consistent with being Delvalle and RUIZ VILLALONA exit the vehicle and enter the front door of 170 Agawam Street. Within seconds, investigators observed the lights to the second floor, right side, closest to the front door (Target Location 3) turn on. At approximately 8:18 a.m. investigators observed Delvalle and RUIZ VILLALONA leave together in a vehicle from Target Location 3 and return to Target Location 2. RUIZ VILLALONA and Delvalle walked up the rear steps and entered Target Location 2 together at approximately 8:32 a.m.

40.     At approximately 8:41 a.m., Delvalle exited Target Location 2 and stood on the landing, carrying a large black purse. Approximately two minutes later, a Hispanic male ("HM") exited Target Location 2 and he and Delvalle drove away together. RUIZ VILLALONA appeared

17

to remain within Target Location 2, as he was observed at approximately 10:13 a.m. smoking a cigarette on the landing outside Target Location 2.

41.     At approximately 12:19 p.m., HM and Delvalle returned to Target Location 2 and HM was observed using a key to open Target Location 2.  Immediately upon opening the door to Target Location 2, a small white dog came from within, which I believe suggests that this rear door leads directly into the apartment of Target Location 2 itself, rather than a common entrance.

42.     At approximately 12:27 p.m. RUIZ VILLALONA, Delvalle, and another Hispanic female departed Target Location 2 and drove directly to Target Location 1.  When the vehicle arrived at Target Location 1, RUIZ VILLALONA walked to enter Target Location 1 as he looked all around him.

43.     At approximately 1:37 p.m., investigators observed Delvalle enter Target Location 2 by herself, carrying a black backpack. At approximately 4:43 p.m., investigators observed HM exit Target Location 2 holding a pair of sneakers and a gray sweatshirt tucked underneath his arm. Partially concealed within the sweatshirt was what appeared to be a black rectangular object. Based on my training and experience, I believe this rectangular object (depicted below, in part) was consistent with a wrapped kilogram of narcotics.



44.     Investigators observed HM walk toward a vehicle, where he opened and closed the trunk.  HM then walked toward the front of the building for Target Location 2 and still appeared to be carrying the clothing items in his arms, but investigators could not tell whether he was still carrying the black object.  At approximately 4:51 p.m., HM reentered Target Location 2, and by this time was not carrying anything at all.  Shortly thereafter, HM departed from Target Location 2.  Massachusetts State Police executed a traffic stop of the vehicle driven by HM. HM consented to a search of the vehicle, but the search did not reveal any items of note and HM was immediately released.  Based on my training and experience, I believe HM carried a kilogram of narcotics out of Target Location 2 and stored or otherwise dispensed with the kilogram near Target Location 2 before he drove away.

45.     Based on the above, I believe that RUIZ VILLALONA and his associates use Target Location 2 as a stash house or storage location for drug trafficking activities.

**Target Location 3**

46.     Target Location 3, 170 Agawam Street, Apartment 3, Lowell, Massachusetts, is an apartment on the second floor of a multi-unit apartment building.  It is on the right side of the building, facing the front entrance, while standing on Agawam Street.

47.     According to records obtained from National Grid, the utilities for Target Location 3 are registered in the name of Delvalle.  Delvalle has also been observed driving a vehicle registered in her name, at the address of Target Location 3.

48.     Investigators have observed RUIZ VILLALONA regularly spending the night at Target Location 3 with Delvalle, and travelling to and from Target Location 3 and the suspected stash house at Target Location 2.  For example, in addition to the observations discussed in paragraph 38 above, in the early morning hours of October 5, 2020 (approximately 12:36 a.m.), investigators observed RUIZ VILLALONA depart from the Target Location 2 building and travel to Target Location 3, arriving at approximately 12:52 a.m.  Within seconds of entering the building, investigators observed the lights to the second floor, right side, closest to the front door, turn on.  Investigators observed that RUIZ VILLALONA had been driven from Target Location 2 to Target Location 3 by Sonia Delvalle.

49.     At approximately 10:36 a.m. this same day, investigators observed RUIZ VILLALONA in the backyard of Target Location 3, smoking a cigarette.  At approximately 11:07 a.m., investigators observed RUIZ VILLALONA and Delvalle leave from the front door of 170 Agawam Street while RUIZ VILLALONA was carrying a white trash bag.  The pair walked over to the common dumpster for the apartment complex.  Delvalle used a key to unlock the dumpster and RUIZ VILLALONA tossed the white bag inside.  RUIZ VILLALONA appeared to be carrying

a black satchel over his shoulder at the time. RUIZ VILLALONA and Delvalle immediately left the area together in a vehicle, at which point investigators retrieved the white trash bag RUIZ VILLALONA had just discarded. Inside, investigators located several empty clear plastic bags, a box with Delvalle's name on it with a shipping address of Target Location 2, and several other documents with Delvalle's name. Based on my training and experience, I know that drug traffickers typically use the type of clear plastic bags discovered to package their drugs for distribution. I also know that many drug traffickers ship drugs using common carriers and that they sometimes ship these packages to addresses other than their residences in an attempt to avoid detection by law enforcement.

50. Meanwhile, RUIZ VILLALONA and Delvalle travelled directly to Target Location 2, where they parked and both walked up the rear stairs to Target Location 2. At approximately 11:27 a.m., investigators observed Delvalle knock on the rear door to Target Location 2, at which point someone opened the door from the inside, admitting RUIZ VILLALONA and Delvalle. At approximately 11:58 a.m., RUIZ VILLALONA left Target Location 2 with an older Hispanic male, who drove him directly to Target Location 1.

51. Investigators have continued to observe RUIZ VILLALONA and Delvalle spending the nights at Target Location 3 and exiting that location with bags capable of carrying large quantities of narcotics. For example, on October 19, 2020, at approximately 11:41 a.m., investigators observed RUIZ VILLALONA and Delvalle exit the front common door to Target Location 3. Delvalle was carrying what appeared to be a computer bag as well as a purse, and RUIZ VILLALONA was carrying a black satchel over his shoulder. The pair placed their bags into a Nissan SUV and drove together to Target Location 2, arriving at approximately 11:57 a.m.

RUIZ VILLALONA and Delvalle retrieved their bags from the Nissan and carried them up the rear exterior stairs and into Target Location 2. Delvalle used a key to open the door to Target Location 2.

52. Later that night, around 11:37 p.m., Delvalle and RUIZ VILLALONA returned to Target Location 3 in the Nissan and carried several bags into Target Location 3. Shortly after they entered the apartment building, the light on the second floor, right hand side of the building turned on.

53. Finally, on October 20, 2020, at approximately 10:35 a.m., investigators observed RUIZ VILLALONA exit the front common door to Target Location 3, carrying one or two shopping bags which appeared to be weighed down by the item or items inside. Delvalle followed RUIZ VILLALONA, again carrying her computer bag and purse. The pair put their respective bags into the Nissan, which then drove away from Target Location 3.

54. Based on the above and the investigation to date, I believe that RUIZ VILLALONA regularly spends the night with Delvalle at Target Location 3 and that the pair then travel together—perhaps transporting narcotics and/or proceeds from the sale of narcotics—in bags as they travel to what I believe is a stash house at Target Location 2. As such, I believe that evidence of RUIZ VILLALONA's drug trafficking activities will be located inside Target Location 3.

55. Based on my training and experience, and the information set out above, I believe the Target Subject, like many drug traffickers, uses his residences and stash house in furtherance of his ongoing drug-trafficking activities, and that, among other things, drug proceeds, drug ledgers detailing drug and/or money transactions, customer lists, telephones used to conduct drug trafficking activities. I further know from my training and experience that drug traffickers

22

commonly use multiple locations to store their drugs and drug proceeds in an effort to evade law enforcement detection, to distance themselves from the contraband, and to disperse their drugs and drug proceeds to avoid being robbed. As discussed above, RUIZ VILLALONA travelled to all three Target Locations immediately before meeting to deliver approximately a kilogram of fentanyl. Accordingly, I believe evidence of the Target Offense as set forth in Attachments B1 through B3, is likely to be stored at each of the Target Locations, as described in Attachments A1 through A3.

<u>Basis for Seizure and Search of Cellular Telephones</u>

56. In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular telephones at the same time, as well as prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Throughout this investigation, the Target Subject has used cellular telephones to communicate about and further his drug trafficking activities.

57. This request to seize and search cellular telephones includes "smartphones," i.e. those cellular telephones that are capable of serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

58.     A cellular telephone is a handheld wireless device used for voice and text communications, as well as for accessing the internet.  Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities, including but not limited to, storing names and phone number in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include GPS technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in order to further prevent detection, and often use text messages in lieu of telephone calls to avoid speaking over the telephone.

59.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files stored on cellular telephones (and particularly smartphones) can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their cellular telephones, they can easily transfer the data from their old cellular telephone to their new cellular telephone;

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file;

c. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

60. Based on my knowledge and training, and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in a cellular telephone, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that the cellular telephone be seized and processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because:

a. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site; and

b. Analyzing cellular telephones is a highly technical process requiring expertise and a properly-controlled environment. It is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Consequently, law enforcement agents may either copy the data at the premises to be searched, or seize the computer equipment for subsequent processing elsewhere. This application seeks permission to search and seize cellular telephones either onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

**CONCLUSION**

61.     Based on the information set forth above, I believe probable cause exists to conclude that, on October 17, 2020, RUIZ VILLALONA distributed 400 grams or more of fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(vi), and further, that evidence of the Target Offense, as set forth in Attachments B, will be found inside the Target Locations, as described in Attachments A.

Adalberto Garcia DEA
_____
Adalberto Garcia
DEA Special Agent

Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 this 21st day of October, 2020.

_____
HONORABLE DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS



## ATTACHMENT A-1

Target Location 1

  Target Location 1 is Apartment 13 at 264 East Haverhill Street, Lawrence, Massachusetts, an apartment within a brick, multi-unit apartment building, which sits within a multi-building apartment complex.  Target Location 1 is located on the second floor of building 264, and has two, red, interior front doors, each individually labeled with the number "13."  Apartment 13 also has a balcony on the rear of the building, which looks out onto Young Avenue.







28



# ATTACHMENT B-1

## (Items to be seized from property)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (fentanyl distribution) (the "Target Offense"):

1. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

6. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8. Cellular telephones used by or belonging to Jose Luis RUIZ VILLALONA, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e. GPS data;

   f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

## ATTACHMENT A-2

Target Location 2

Target Location 2 is located at 19 Haverhill Street Methuen, Massachusetts, which is a two-story building which appears to have an attic and basement level. Target Location 2 is the apartment which can be accessed via the rear outdoor stairs, which lead to a white exterior entrance door. The door to Target Location 2 sits just to the right of the staircase, on the wooden landing/deck area on the second floor. This entrance door appears to be unnumbered.







# ATTACHMENT B-2

## (Items to be seized from property)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (fentanyl distribution) (the "Target Offense"):

1. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

6. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7.    Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8.    Cellular telephones used by or belonging to Jose Luis RUIZ VILLALONA, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a.    Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.    Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d.    Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e.    GPS data;

   f.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g.    Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   h.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   i.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

<u>**Attachment A-3**</u>

Target Location 3

Target Location 3, 170 Agawam Street, Apartment 3, Lowell, Massachusetts, is an apartment on the second floor of a multi-unit apartment building. It is on the right side of the building, facing the front entrance, if one is standing on Agawam Street. It can be accessed via the front entrance to the brick building, which is a white door with the number "170" affixed to the left of the door.





# ATTACHMENT B-3

## (Items to be seized from property)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (fentanyl distribution) (the "Target Offense"):

1. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

6. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8. Cellular telephones used by or belonging to Jose Luis RUIZ VILLALONA, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

    a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

    b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

    d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    e. GPS data;

    f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

    i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.